IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2013

## MICHAEL MARTIN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 07-06810     John T. Fowlkes, Jr., Judge**

**No. W2012-01678-CCA-R3-PC  - Filed April 11, 2014**

The Petitioner, Michael Martin, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his 2009 convictions for attempt to commit second degree murder, aggravated assault, and violating an order of protection and his effective eighteen-year, eleven-month, and twenty-nine-day sentence. The Petitioner contends that he received the ineffective assistance of counsel because counsel (1) failed to interview and present a witness at the trial, (2) failed to object contemporaneously to the admission of the narrative portion of the order of protection, and (3) failed to include the transcript of the motion for a new trial hearing in the appellate record. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Warren Patrick Campbell, Memphis, Tennessee, for the appellant, Michael Martin.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Senior Counsel; Amy P. Weirich, District Attorney General; and Alycia Carter Peoples, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the Petitioner's stabbing his estranged wife. This court summarized the facts of the case in the appeal of the Petitioner's conviction:

> At trial, the victim testified that she was the defendant's wife and had known him "[a]ll [her] life." She began dating the defendant in 2004, and the

two were married in November 2005. A year and a half later, the victim moved out because she was tired of the defendant's "[a]busive, arguing and controlling" behavior and went to live with her grandparents, James and Barbara Watson. After she moved out, the victim and the defendant were "back and forth" with regard to the future of their relationship, and she spent the night with him from time to time. However, in January 2007, the victim obtained an order of protection against the defendant because "[h]e was always calling . . . and following [her] different places." Even after the protection order, the victim and the defendant continued to contact each other and were occasionally romantically involved, but eventually the victim decided that "it was going to be a repeated cycle of doing the same stuff over and over again [and] wanted to be through with it."

On May 17, 2007, the defendant called the victim several times, questioning her about whether she was dating anyone and threatening, "I can get you if I want you[.]" When the victim left her grandparents' house with a girlfriend around 6:00 p.m. that evening, she noticed a suspicious car following them that she assumed was driven by the defendant. She had her friend take her home and, once she was out of the defendant's sight, went to a neighbor's house and waited until her grandparents came home around 9:00 p.m. The defendant began repeatedly calling her as soon as she got home, asking where she had been and why she would not return his calls. The victim eventually turned off the ringer on the phone.

Around midnight, the defendant "c[a]me beating on the door asking could he come in." The victim's grandfather let the defendant in and started talking to him. The victim was nearby but was not paying attention to what the defendant was saying because she "didn't want to hear it." After a few minutes, the defendant went to the restroom and, about five minutes after he returned, he "grabbed [the victim] and just went to sticking [her]." The victim did not see the defendant with a knife or anything sharp, but she knew that he frequently carried a pocketknife with a three- or four-inch blade. During the altercation, the victim's grandparents ended up on the floor. The defendant then ran outside, leaving the front door open. When the victim realized that she had been stabbed, she had her grandfather take her to the hospital where she was treated and released. She had one stab wound to her left breast, two to her left side, and one toward the top of her head. The next day, the defendant called the victim and apologized.

The victim testified that she believed the defendant came to her grandparents' house that night with the intention of hurting her because she "could hear it in his voice [that] he was up to no good." She noted that the defendant's facial expression was "angry," which made her feel "scared."

Michael Triplett, records keeper for the Shelby County General Sessions Criminal Court, testified that the victim petitioned the court for an order of protection against the defendant on December 29, 2006. As the factual basis for the petition, the victim alleged that the defendant "accused her of cheating" and "hit her in the face with a closed fist; hit her in the nose, which caused her nose to spread and eye to blacken." She also alleged that the defendant threatened that the police could not stop him from getting to her and that "[i]f he gets locked up, he will be plotting on how he is going to get her." The victim further alleged that the defendant hit her in the head with a gun on December 13, 2006. The court issued an ex parte order, and the defendant was informed that a hearing would be held in two weeks. The defendant and the victim both appeared at the hearing on January 16, 2007, and a final order of protection was entered directing the defendant to stay away from the victim.

Barbara Watson, the victim's grandmother, testified the defendant came to their house the night of the incident around midnight wanting to talk to her and Mr. Watson about the defendant's relationship with the victim. Mr. Watson let the defendant in the house, and the three of them sat down in the kitchen and began to talk. At some point, the defendant went to the bathroom and, when he returned, stood in the doorway into the kitchen. The defendant said a few more words and then said, "'And you'" and lunged at the victim. Mrs. Watson stood up to stop the defendant from hitting the victim, but her chair tipped over and she fell to the floor bruising her arm. Mr. Watson tried to keep her from falling, but somehow fell himself. Mrs. Watson saw the defendant and the victim "tussling together," then the defendant left the house.

On cross-examination, Mrs. Watson acknowledged that the defendant did not shout or behave unruly during their conversation while seated at the kitchen table. Mrs. Watson observed that the victim did not say anything to the defendant prior to him lunging at her.

James Watson, the victim's grandfather, testified that on the night of the incident the defendant arrived at their house around midnight, saying that he needed to talk to him and Mrs. Watson. Mr. Watson let the defendant in the house, and the three of them sat at the kitchen table and discussed the

relationship between the victim and the defendant. At some point, the victim entered the kitchen but would not sit down at the table when requested to by the defendant. Mr. Watson observed that the defendant looked "upset" and like "[s]omething was on his mind." The defendant left the kitchen to use the restroom and, when he returned, did not sit down. The defendant said a few words, then said to the victim, "'And you,' and he grabbed her." It appeared to Mr. Watson that the defendant began hitting the victim, and when Mr. Watson saw this, he started to get up from the table, but the defendant's boot pushed Mr. Watson's leg and he fell to the floor. The defendant ran out of the house, and Mr. Watson saw that the victim had been stabbed in the head and side. A few days after the incident, while Mr. Watson was at the police station making a report, the defendant called him and apologized.

On cross-examination, Mr. Watson acknowledged that the defendant never yelled at them during their conversation but did somewhat raise his voice when he said, "'And you'" to the victim before the attack.

Officer Marcus Lee with the Memphis Police Department testified that he was dispatched to Methodist South Hospital to investigate the stabbing of the victim. The victim advised Officer Lee that the defendant had stabbed her. He recalled that the victim told him that the defendant had been calling her to meet and that she finally agreed to talk to him. She said that they were talking in the kitchen, then the defendant went to the restroom. Upon his return, the defendant grabbed an object and started stabbing her. Officer Lee saw the victim's head wound but did not see her body wounds.

After the conclusion of the proof, the jury convicted the defendant of the lesser-included offense of attempted second degree murder, as well as aggravated assault and violation of an order of protection as charged in the indictment.

*State v. Michael Martin*, No. W2010-00466-CCA-R3-CD, slip op. at 2-4 (Tenn. Crim. App. Mar. 30, 2011).

At the post-conviction hearing, counsel testified that the primary issue in the Petitioner's case was intent. He thought the case was "over indicted" regarding the attempt to commit first degree murder charge. He said the intent to commit premeditated murder or to knowingly or intentionally kill someone was not supported by the facts. He said that the State made a "decent offer" but that the Petitioner rejected it. He discussed the plea offer

-4-

with the Petitioner but could not recall the details. He thought the offer was six to ten years at thirty percent service for aggravated assault. He said that the Petitioner was on parole in Arkansas at the time the offenses were committed and that his pleading guilty to the Tennessee charges would have caused problems for him in Arkansas.

Counsel testified that he met with the Petitioner at the jail and in court before the trial and sent the Petitioner letters during his representation. He said he obtained the Petitioner's medical records from the State. When asked if he considered hiring an expert to determine if the victim's wounds were life threatening, he said he did not think any judge would have permitted it. He said that although the victim testified that she could not determine what the Petitioner had in his hand at the time of the assault, he did not depose a physician who could determine the type of weapon used. He said the issue was the Petitioner's intent, not the weapon that caused the injuries. He recalled that the assault occurred "for a little bit of time and then [the Petitioner] ran out the door." He could not recall if he highlighted this in his opening statement and closing argument.

Counsel testified that an order of protection containing a factual statement supporting the basis for the order was effective at the time of the assault. He did not recall if he objected to the State's witness reading the factual statement into evidence. He agreed the order of protection would have been included in the State's discovery package and said the discovery package was mailed to the Petitioner on November 7, 2007.

Counsel testified that the victim's grandparents testified at the trial that they suffered injuries during the assault on the victim. He recalled Barbara Watson testified that she was "knocked over." He said he did not object because she was an eyewitness and was able to testify about what she saw and what occurred. He said that he learned the testimony was raised in the appeal of the Petitioner's conviction and admitted that he did not raise the issue in the Petitioner's motion for a new trial.

Counsel testified that the Petitioner gave him three letters from the victim to the Petitioner that were used at the Petitioner's insistence to attempt to negate the intent element of the attempted first degree murder charge. A December 22, 2007 letter stated, "If you thought I was looking at someone else, I was b---- this, punched, slapped, kicked, spit on, et cetera, but always there Mike. . . . I fear you. You are dangerous." A second letter stated, "And one more request, could you stop calling me b------ and et cetera in front of people. In the third letter, the victim discussed the Petitioner's previous ten-year incarceration, his changing his life when he was released from prison, and his not engaging in criminal activity after his release. Counsel stated that although he understood the Petitioner thought the letters might show a lack of intent to commit murder, counsel did not want the information in the letters presented to the jury. He said that although it appeared the victim was apologizing

-5-

and wanted to be in the Petitioner's life, the letters did not show that the victim lied about the assault or that the assault did not occur. He agreed the third letter stated, "Please, please, please give me the chance to show you that I can be the Mrs. Martin that you want." He disagreed that the passage negated the required intent and said that it showed the victim still loved the Petitioner and wanted to reconcile with him and that the victim did not "paint that picture" of the Petitioner at the trial. He did not want to introduce the letters but attempted to present the letters because the Petitioner "felt so strongly about it."

Counsel testified that he could not recall if the Petitioner gave him text message records of conversations between the Petitioner and the victim. He said, though, he reviewed them if the Petitioner provided them. He speculated that the text messages were similar in nature to the letters. He said that if they were similar, the text messages did not establish a lack of intent and probably would have been excluded as irrelevant.

Counsel testified that he discussed with the Petitioner reducing his bond but that Arkansas placed a hold on him for violating his parole, which would have prevented the Petitioner's release from custody. He agreed he obtained an audio recording of the preliminary hearing and said he reviewed the victim's testimony before the post-conviction hearing. He said that the victim's preliminary hearing testimony "followed" her trial testimony and that had her trial testimony contradicted her previous testimony, he would have impeached her on that basis. He thought it was significant in the victim's preliminary hearing testimony that she was unable to identify the weapon used and said the Petitioner stopped assaulting her and ran away. He agreed the victim provided similar trial testimony.

Counsel testified that he did not know if the Petitioner requested a transcript of the preliminary hearing and denied that he had a transcript prepared. He said the audio recording and his personal notes taken during the hearing were the only records he had of the hearing. When asked if the Petitioner asked him to present particular witnesses at the trial to explain "what was going on" between the Petitioner and the victim, counsel stated that the Petitioner, the victim, and Mr. and Mrs. Watson were present when the assault occurred. He said that no other witnesses existed and that anything else was irrelevant.

Counsel testified that the State's theory was that the Petitioner stalked the victim and that the State used the order of protection violation to show that the Petitioner followed the victim. He spoke to Gloria Martin, the Petitioner's mother, Mr. Watson, the victim's father, and Andrea Watson, the Petitioner's stepfather, before the trial. He said that if witnesses existed who could have testified that the Petitioner did not violate the order of protection, he would have presented them at the trial. He said that he did not request special jury instructions and that his focus was on the lesser included offenses, for which the trial court instructed the jury with "criminal attempt first down to assault."

-6-

Counsel testified that the Petitioner told him before the trial that he was in a relationship with Sandra Furlow. He did not recall whether Ms. Furlow could testify about what occurred on the night of the offenses but said if someone could have testified about what occurred, he would have presented the person at the trial. He did not recall whether he emphasized in his closing argument that attempted murder was a specific intent offense.

Counsel testified that the Petitioner's two previous convictions in Arkansas were used to enhance his sentence. He did not recall if the State submitted a "field report" regarding one of the previous convictions or if he objected to its admission. He agreed, though, that the transcript would reflect what occurred at the sentencing hearing. He recalled that one of the previous convictions involved a crime not defined in Tennessee and that the Petitioner received 240 months' incarceration. He said he argued at the sentencing hearing that the Petitioner was a Range I offender, not Range II. He recalled that this court considered the offense to be similar to reckless homicide, making the Petitioner a Range II offender.

Counsel testified that the Petitioner did not testify at the trial, that he advised the Petitioner not to testify, and that he told the Petitioner it was the Petitioner's decision. He recalled that the Petitioner's previous convictions were excluded from the trial because the trial court found them to be prejudicial and that the court advised the Petitioner of its ruling during the *Momon* hearing.

On cross-examination, counsel testified that he had practiced criminal law for eight years and had tried thirteen to fourteen cases in state and federal courts. He said that he was assigned to the Petitioner's case in September 2007 and that the trial was held in July 2009. He said that during that time, they discussed the case, the theory, the evidence, and counsel's opinion that the facts did not support attempt to commit first degree murder. He agreed the State made a "decent offer" and said he explained the risks and benefits of accepting the offer. He said the Petitioner knew the risks. He said the Petitioner wanted an assault conviction "because he [took] care of the Arkansas parole violation." He understood that the Petitioner's parole officer would not file a violation warrant if the Petitioner was convicted of assault. He recalled the offer was for aggravated assault in the six- to ten-year range.

Counsel testified that the evidence showed the Petitioner was at the victim's house but that the Petitioner said he was not there to kill anyone. He said no alibi witnesses existed who could have placed the Petitioner somewhere else at the time of the offenses.

Upon examination by the trial court, counsel testified that before the trial date, he and the Petitioner had sufficient time to discuss the Petitioner's case, the theory, the trial strategy, and whether the Petitioner wanted to accept a plea offer. He said he answered all the Petitioner's questions and had sufficient time to investigate the Petitioner's case. Regarding

-7-

the theory of the case, counsel said that although the Petitioner did not have an alibi and that the facts established the Petitioner was at the victim's house, the Petitioner did not have an intent to kill the victim. He agreed they discussed the victim's injuries, the weapon, abandoning the encounter, and the order of protection.

Appellate counsel testified that he handled the motion for a new trial and the appeal of the Petitioner's convictions. He said he raised issues regarding the sufficiency of the evidence for the attempted second degree murder conviction, prejudicial photographs introduced at the trial, evidence of the victim's grandparents' injuries, a cumulative error argument, and sentencing. He agreed this court affirmed the judgments of the trial court. Regarding the Petitioner's sentence, he said this court concluded that the trial court erred in classifying one of the previous Arkansas convictions and reclassified the conviction in such a manner that the Petitioner remained a Range II offender.

Appellate counsel testified that he recalled discussing with the Petitioner the possibility that fabricated evidence was presented at the trial, that such an allegation was difficult to prove, and that post-conviction proceedings were the best way to address it. He did not recall the "field report" presented during the sentencing hearing. Regarding the sufficiency of the evidence, he said he did not frame the issue as one relating to the State's failure to prove the Petitioner's specific intent. He said that attempted second degree murder was a result of conduct offense and that the basis for relief was that sufficient provocation existed to justify an attempted manslaughter conviction. Regarding sentencing, he said he successfully argued that one of the Arkansas convictions was reckless homicide, not second degree murder as the trial court found. He said his ultimate goal was to have this court classify the offense as negligent homicide. He denied that had the "offense report been correct or different," the outcome of the appeal would have been different because a statutory element analysis comparing his Arkansas convictions with Tennessee offenses was involved. He agreed this court mentioned the Petitioner's discharging the weapon into a crowded park.

Appellate counsel testified that the transcript of the motion for a new trial hearing was inadvertently excluded from the appellate record. He agreed that this court waived the issue for failure to object at the trial and for failure to include in the appellate record the transcript of the hearing on the motion for a new trial. He agreed that in any event, this court concluded that no prejudice existed because the Petitioner did not deliberately engage in the conduct but rather accidentally "bumped into them." The motion for a new trial transcript was received as an exhibit.

On cross-examination, appellate counsel testified that he received the transcripts and the pretrial and post-trial motions in preparing an appellate brief. He said that although it might have been nice to raise every potential issue, he raised the best issues to maintain a

level of credibility. He did not raise issues without merit. He said he thought the sentence within the range was proper but chose to challenge the sentencing range.

Upon examination by the trial court, appellate counsel testified that he visited the Petitioner at the jail to discuss the motion for a new trial hearing and that after the hearing, he communicated with the Petitioner by mail and by telephone. He agreed he had ample opportunity to discuss with the Petitioner the appellate brief and the issues he intended to raise. He did not recall any specific issue that the Petitioner wanted raised in the appeal and agreed the Petitioner was aware of the issues he planned to raise.

Gloria Watson, the Petitioner's mother, testified that she attended the Petitioner's court appearances and that she spoke to counsel about the case. She said counsel did not ask her if she had information about which she wanted to testify or if she was knowledgeable about the Petitioner and the victim's relationship. She said their relationship was good based on her observation of the couple at family functions. She denied knowing of any problems between the couple at the time of the offenses but said that the Petitioner required the victim to leave their house and that they had "some disagreements or whatever." She denied knowing why the victim left.

Ms. Watson testified that she learned the Petitioner wanted a divorce but that the victim would not consent. She denied knowing why the Petitioner wanted a divorce. She knew the victim's grandparents but denied talking to them about the Petitioner and the victim's relationship or the Petitioner's desire for a divorce. She denied witnessing the events leading to the Petitioner's arrest.

On cross-examination, Ms. Watson testified that she did not volunteer any information about the Petitioner and the victim's relationship because counsel said any information she had was irrelevant due to the text messages and letters. She denied knowing what occurred between the Petitioner and the victim the night the offenses were committed.

Upon examination by the trial court, Ms. Watson testified that she possessed letters and text messages from the victim to the Petitioner. When asked if she gave them to counsel, she said counsel told her he did not need them. She identified the letters previously received as a collective exhibit as the letters she attempted to give counsel. She denied reading them and said the Petitioner asked her to give them to counsel. She said that text messages between the Petitioner and the victim were on the Petitioner's cell phone and that she typed each message. She said that she told counsel about the text messages but that he thought they were not important. She agreed she did not know what occurred between the Petitioner and the victim when she was not around them.

Ms. Watson testified that the incident in which the Petitioner "put out" the victim occurred in 2006 but could not recall the specific time of year. She said that she did not pry into the Petitioner's and victim's lives but that the victim mentioned divorce once.

Walter Joyce, the Petitioner's brother, testified that he spoke to counsel about the Petitioner's case and that counsel was supposed to call him as a witness at the trial and at the sentencing hearing but did not. He said he knew the victim well and considered her to be "very jealous hearted." He said that when the Petitioner wanted to do something with him, the victim did not want the Petitioner to go. He said he witnessed the victim's chasing the Petitioner through the house with a butcher knife. He said the victim initiated the violence, which occurred about one year before the Petitioner's arrest. He denied witnessing the incident at the victim's grandparents' house.

Mr. Joyce testified that he knew the Petitioner wanted a divorce and was dating Sandra Furlow at the time of the offense. He said that at that time, the victim continuously called the Petitioner and broke into the Petitioner's house. He recalled one incident when the victim asked the Petitioner to bring her license plate to her grandparents' house. He said that when the Petitioner arrived, men were there who tried "to do something" to the Petitioner. He said the victim could not handle the Petitioner's dating another woman and ending their relationship. He said that he attempted to provide counsel these facts but that counsel did not seem concerned about it. Although he could not recall if he was subpoenaed for the trial, he was present every day of the trial.

On cross-examination, Mr. Joyce testified that he lived with the Petitioner and the victim for about six months. He agreed it was possible that he did not know everything that occurred between the couple. He denied scheduling a meeting to talk to counsel or writing him a letter but said he attempted to talk to counsel every time he saw counsel.

Andrea Watson, Sr., the Petitioner's stepfather, testified that he had known the Petitioner since 2002. He said he met counsel once or twice. He said the victim was his cousin. He said that before the offense, he did not "hang out" with the victim because she had "never been right" and that the victim did not treat people right. He denied that counsel asked him if he had any information that would help the Petitioner's case and said that he was not present during the offense. He knew the Petitioner wanted a divorce but denied knowing why he wanted it. He denied witnessing any violence between the Petitioner and the victim. He stated that although the Petitioner was incarcerated for attempting to kill the victim, she refused to sign the divorce papers.

The Petitioner testified that over the course of counsel's representation, he asked counsel to challenge the indictment because it did not allege an overt act and was not signed by the prosecutor. He said he asked counsel to challenge several pretrial issues and asked counsel to raise several issues on appeal. He said that the State's discovery package was incomplete and that he asked counsel why the victim's criminal history was missing. He knew the victim was previously convicted of theft and forgery and thought those convictions could be used to show the victim's dishonesty. He asked counsel for medical records regarding the victim's injuries because he contended the victim was cut by keys, not by a knife. He said the preliminary hearing transcript and his previous criminal history were also missing from the discovery package. He said counsel told him that the burden of proof was on the State and that the Petitioner did not have to present any evidence.

The Petitioner testified that pages of the order of protection were missing from the discovery package and that the missing information related to the narrative of facts underlying the order. He said that the information was damaging and that had he known the information, he would have pleaded guilty.

The Petitioner testified that counsel did not discuss the defense theory and that counsel said, "[Y]ou really don't have to offer a defense so don't worry about that." He asked counsel to talk to his mother, brother, Ms. Furlow and her daughter, Polly Rogers, and his realtor, Connie. He said he wanted counsel to talk to Connie because he asked Connie not to disclose his address to the victim, although the victim ultimately learned his new address. Regarding the defense theory, he wanted counsel to stress that he only had keys in his possession and that the victim's injuries were not inflicted intentionally. He wanted the jurors to understand that he did not go to the victim's grandparents' house for a confrontation but rather to ask Mr. Watson to assist him in getting the victim to agree to a divorce. He said that he did not show up unannounced and that Mr. Watson gave him permission to come to their house. He denied knowing the victim was there.

The Petitioner testified that he did not testify at the trial and that counsel advised him not to testify, although counsel did not explain why. He said counsel remained adamant about his not testifying after the trial court excluded his previous convictions. He said, though, he wanted to explain his version of the events. He said he knew it was his decision to testify but trusted counsel and accepted his advice.

The Petitioner testified that he talked to appellate counsel a couple of times and that he provided appellate counsel "a complete package" after the sentencing hearing. He said he provided counsel a handwritten list of the issues he wanted raised on appeal, which was received as an exhibit. He said counsel did not respond. He wrote counsel later, although he could not recall when, regarding the disparate treatment between male and female

defendants and asked counsel for a "Baldus study" focusing on the topic. He believed male defendants received harsher treatment than female defendants. He received no response from counsel.

On cross-examination, the Petitioner testified that he did not have proof showing counsel withheld discovery information intentionally but that he did not receive all the documents. He also did not have proof showing that the alleged missing documents were provided to counsel in the State's discovery package. He agreed he testified before the trial court and stated that he had chosen not to testify at the trial. He agreed counsel stated on the record that he advised him not to testify but that it was the Petitioner's decision. He decided not to testify before the court excluded the letters.

The Petitioner testified that the people he wanted counsel to call as witnesses would have testified about the status of his and the victim's relationship, namely that he wanted a divorce. He said the witnesses would have negated the State's theory that he stalked the victim.

Regarding the handwritten list of issues previously received as an exhibit, the Petitioner testified that he knew every issue could not have been raised in the appeal but that he wrote them down because counsel continuously told him it was not the time to address his issues. He denied that appellate counsel told him that he chose the strongest issues to raise in the appeal. He said he allowed appellate counsel to "do his thing" because he was a well-respected attorney. He thought appellate counsel would do the "right thing" after learning he was the victim of an injustice.

The trial court found that counsel did not provide ineffective assistance and denied relief. The Petitioner raised in his petition for post-conviction relief twenty issues regarding the ineffective assistance of counsel. We address only those raised on appeal.

Regarding the Petitioner's contention that counsel was ineffective for failing to interview and present Walter Joyce at the trial, the trial court found that it was "not always in the best interest of the defendant to call every witness who can be called." The court found that although "certain witnesses" may have corroborated the Petitioner's theory of the case, the witnesses' credibility "could have been severely damaged" on cross-examination. The court found that the decision to present witnesses was strategic and that the court would not second guess counsel's tactical and strategic decisions. The court found that the Petitioner was not prejudiced by the "exclusion" of the witnesses.

Regarding the Petitioner's contention that counsel was ineffective for failing to object contemporaneously to the narrative portion of the order of protection being read into evidence, the trial court found that he failed to show how counsel was deficient. After reviewing the trial transcript, the court found that counsel made several arguments to suppress the order of protection, although he did not cite to any numerical rule of evidence. The court found that this did not fall below the objective standard of reasonableness and that counsel's argument before the court was not deficient.

Regarding the Petitioner's contention that appellate counsel was ineffective for failing to include the transcript of the hearing on the motion for a new trial in the appellate record, the trial court found that counsel did not include the transcript. It noted that although this court concluded that the issue of the victim's grandparents' injuries was waived due to counsel's failure to object at the trial and appellate counsel's failure to include the transcript in the record, this court found no prejudice existed. The trial court agreed and found that had the issue not been waived on appeal, the Petitioner would not have received relief because it was not alleged that the Petitioner intentionally caused the grandparents' injuries. The court stated that because it found no prejudice in failing to include the transcript, it need not address whether counsel provided deficient performance on appeal. This appeal followed.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, there is "a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." *Id.*

**I**

The Petitioner contends that he received the ineffective assistance of counsel because counsel failed to interview and present Walter Joyce as a witness at the trial. He argues that Mr. Joyce's testimony regarding the victim's previous violent conduct toward the Petitioner and the abusive nature of her relationship with the Petitioner would have negated the intent element of attempted murder. The State contends that counsel was not ineffective because Mr. Joyce was not present during the offenses and could not have testified about what occurred. We agree with the State.

Counsel's chosen defense theory was that although the Petitioner was present at the time of the attack, the Petitioner did not have the intent to kill the victim. The record shows that before the trial, counsel spoke with the Petitioner's mother, the victim's father, and the victim's brother. Although counsel did not recall talking to Mr. Joyce before the trial, Mr. Joyce testified at the post-conviction hearing that he and counsel spoke before the trial. Although Mr. Joyce thought he would be called as a witness at the trial, he admitted he was not present at the time of the attack. Mr. Joyce could not provide an alibi by placing the Petitioner somewhere other than at the location of the attack. We note that Mr. Joyce wanted to testify about the turbulent nature of the victim and the Petitioner's relationship and the victim's initiating violence at times. Although the victim might have initiated violence against the Petitioner at times during their relationship, no evidence exists or was presented at the trial showing that the victim initiated violence when the offenses were committed. The victim's grandparents were the only witnesses to the offenses, and they did not testify that the victim initiated the attack. We cannot conclude that counsel was deficient by failing to call Mr. Joyce as a witness or that the Petitioner was prejudiced. He is not entitled to relief on this basis.

-14-

The Petitioner contends that he received ineffective assistance because counsel failed to object contemporaneously to the narrative portion of the order of protection being entered into evidence at the trial. He argues that the evidence was irrelevant and testimonial hearsay. The State responds that the factual basis for the order of protection was relevant because the jury was asked to determine whether the Petitioner violated the order. The State does not address whether the order was inadmissible testimonial hearsay. We conclude that the Petitioner is not entitled to relief.

Regarding the Petitioner's contention that counsel was ineffective for failing to object contemporaneously to the narrative portion of the order of protection, the trial court found that he failed to show how counsel was deficient. After reviewing the trial transcript, the court found that counsel made several arguments to suppress the order of protection, although he did not cite to any numerical rule of evidence. The court found that counsel's arguments were not deficient.

The record shows that at the trial, Michael Triplett, custodian of the records for the Shelby County General Sessions Court, testified that the victim petitioned the court for an order of protection on December 29, 2006. An *ex parte* order was obtained on January 2, 2007, and a hearing was held on January 16. An agreed order was entered on January 16, prohibiting the Petitioner from contacting the victim and from possessing a firearm or ammunition for one year.

Mr. Triplett read the factual basis for the petition, which stated,

On or about December 25th, 2006, Michael Martin, the victim's spouse, picked her up from a friend's home and accused her of cheating and did physically assault her. The victim states that Michael Martin hit her in the face with a closed fist; hit her in the nose, which caused her nose to spread and eyes to blacken. The victim further states that Michael Martin stuck his fingers under her tongue threw her across the floor while . . . making threats such as 'the police can't stop me from getting to you. I'll get to you – get to the ones you love.' If he gets locked up, he will be plotting on how he is going to get her.

The victim states that Michael Martin had assaulted her on prior occasions specifically on December 13th of 2006 in which he hit her in the head twice with a gun and caused the left side of her head to bleed. A report

was filed on December 20th, 2006 in reference to this at the Hickory Hill precinct.

On cross-examination, Mr. Triplett testified that he was not present in court when the agreed order of protection was entered and denied witnessing the victim and the Petitioner sign the agreed order. Mr. Triplett read from the petition that the victim "has been subject to threatened with or placed in fear of abuse, domestic abuse, stalking or sexual assault by respondent." He agreed no police report from the Hickory Hill precinct was attached to the petition and said the *ex parte* petition was not a finding of guilt. He said the agreed order showed that no testimony was given and that the Petitioner made no admissions of wrongdoing.

A jury-out hearing was held prior to Mr. Triplett's testimony to determine the admissibility of the narrative. Counsel argued that although the order of protection itself was relevant to whether the Petitioner violated the order, the victim offered no testimony at the hearing, and the Petitioner made no admissions. He agreed the victim and the Petitioner "signed off" on the order. Counsel said the problem with the order was "all this other stuff that is attached to it." He objected to the admission of the Petitioner's threatening statements, abusive language, and conduct occurring over an eighteen-month period before the order was obtained. He denied that the statements showed the Petitioner's intent on the night the offenses were committed. Counsel argued that even if the material was relevant, the prejudicial value "totally weigh[ed] any probative value."

The prosecutor argued that the material corroborated the victim's testimony regarding the nature of her relationship with the Petitioner and that it showed the Petitioner's motive for his committing the offenses. She noted that evidence of the Petitioner's assaulting and threatening the victim and her reasons for leaving the Petitioner were presented to the jury through the victim's testimony. She also argued that the victim testified that she continued to be romantically involved with the Petitioner after the order was obtained and that it was not until the victim ended her relationship with the Petitioner that the offenses occurred. She said the victim's ending contact with the Petitioner might have been the Petitioner's motive for the attack.

The trial court found that the victim testified at the trial that her relationship with the Petitioner was abusive, that she left the Petitioner in 2006, that they continued to see each other on occasion, that she obtained an order of protection in 2007, and that she continued to see the Petitioner until the time the offenses occurred. The court found that counsel asked the victim on cross-examination, "[Y]ou weren't really afraid of him, were you?" The court found that counsel attempted to show that the order of protection was meaningless based on the victim's continued interaction with the Petitioner.

-16-

Counsel responded that allowing the narrative into evidence was tantamount to permitting the State to introduce evidence of a previous conviction. He argued that although he would be permitted to cross-examine the custodian of the records, the custodian did not know everything about the order or the victim and Petitioner's relationship. Counsel admitted that the order was proof that an agreed order existed but that no proof existed showing the allegations contained in the order were true.

The trial court found clear and convincing proof based on the victim's trial testimony that the allegations in the petition for the order of protection occurred. The court found that the order corroborated the victim's trial testimony regarding the nature of her relationship with the Petitioner and why she wanted to end the relationship. The trial judge stated, "I don't think it's anything that would be so outrageous or so prejudicial for the jury to hear that it would really swing this case." The court found that the order was relevant to show the Petitioner's intent on the night the offenses were committed. The court found that the probative value outweighed the danger of unfair prejudice.

The record shows that counsel objected to the admission of the narrative portion of the order of protection on the ground that it was irrelevant for determining whether the Petitioner violated the order of protection. *See* Tenn. R. Evid. 402. Likewise, counsel argued that even if the trial court found that the narrative was relevant, the probative value was substantially outweighed by the danger of unfair prejudice. *See id.* 403. Counsel feared that although the Petitioner made no admissions regarding the allegations underlying the order and no testimony was presented at the hearing, the jurors would find that the Petitioner committed the alleged acts. In essence, counsel further argued that admission of the narrative violated the prohibition of evidence to prove action in conformity. *See id.* 404(b). Thereafter, the trial court made the appropriate findings pursuant to Rule 404(b)(1)-(4).

The record shows, though, that counsel did not argue at the trial that admission of the narrative was testimonial hearsay in violation of *Crawford v. Washington*, 541 U.S. 36, 68 (2004). In *Crawford*, the Supreme Court concluded that the standard for the admissibility of hearsay statements under the Confrontation Clause is that "testimonial" hearsay is admissible when the declarant is unavailable and there was a "prior opportunity for cross-examination." At the jury-out hearing, the State argued that the narrative was not offered to show that the Petitioner committed the acts alleged by the victim in the narrative but rather was used to show the nature of the victim and Petitioner's relationship before the offenses were committed and to show a potential motive for the Petitioner's conduct. By using the narrative to establish the nature of the relationship and the possible motive, the narrative must be viewed as substantive evidence. As a result, the narrative contained hearsay evidence. *See* Tenn. R. Evid. 801(c) (Hearsay is "a statement, other than one made by the declarant while testifying at the . . . hearing, offered in evidence to prove the truth of the matter

-17-

asserted.").

At the hearing on the petition for an order of protection, no evidence was presented, and no testimony was provided by the victim or the Petitioner. The Petitioner was not afforded an opportunity to cross-examine the victim at the hearing regarding her allegations in the narrative. The Petitioner, though, was afforded the opportunity to cross-examine the victim at the trial. The United States Supreme Court stated in *Crawford* that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [her] prior testimonial statements." *Crawford*, 541 U.S. at 59 n.9. Likewise, the Court stated that the Confrontation Clause "does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Id*. Our supreme court interpreted article 1, section 9 of the Tennessee Constitution in the same fashion. *See State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008) (concluding that article I, section 9 of the Tennessee Constitution does not require a different result than *Crawford*). The victim testified at the trial and was cross-examined by the Petitioner. Although the victim was not questioned regarding the hearsay evidence contained in the narrative, nothing prevented the Petitioner from questioning her about it. As a result, we cannot conclude that counsel was deficient by failing to object to the narrative on the ground that it violated the Confrontation Clause. The Petitioner is not entitled to relief on this basis.

### III

The Petitioner contends that appellate counsel was ineffective because he failed to include the transcript of the hearing on the motion for a new trial in the appellate record. He argues that evidence of the victim's grandparents' injuries sustained during the offenses was irrelevant and prejudicial and caused the jurors to "dislike" the Petitioner. He argues that because counsel failed to include the transcript in the appellate record, this court concluded the issue was waived and that this court would have granted a new trial had the transcript been included. The State contends that although the transcript was not included in the appellate record and that this court concluded the issue was waived, this court also concluded that the Petitioner was not prejudiced by the grandparents' testimony. We agree with the State.

In the appeal of the conviction, the Petitioner argued that the trial court erred by allowing evidence of the victim's grandparents' injuries sustained during the commission of the offenses. This court noted that the Petitioner waived the issue because he failed to object contemporaneously at the trial. *See* T.R.A.P. 36(a). This court summarized the trial court proceeding relevant to the grandparent's injuries.

During a jury-out hearing regarding the admissibility of the order of protection the victim obtained against the defendant, the defendant also objected to the admissibility of photographs of the victim's grandparents depicting injuries allegedly sustained during the altercation. The defendant argued that the photographs were not relevant because the indictments were all regarding injuries to the victim and, even if relevant, the probative value was outweighed by the prejudicial effect. The trial court reserved ruling on the issue until the grandparents testified.

Later, Barbara Watson testified that she fell over a chair when she jumped up to help the victim and sustained a bruise on her arm. James Watson testified that he got up to help Mrs. Watson, but the defendant's "boot or something" pressed against his leg and he fell. The State did not attempt to introduce the photographs of Mr. and Mrs. Watson's injuries, and the only objection by the defense came when the prosecutor asked Mr. Watson if the defendant pressed his boot against Mr. Watson's leg on purpose. Before the trial court ruled on the objection, Mr. Watson stated, "[I]t was not on purpose."

*Michael Martin*, slip op. at 6.

This court noted that the Petitioner failed to object during the testimony, as the objection during the jury-out hearing was related to the photographs of the injuries. Likewise, this court concluded that although the issue was raised in the amended motion for a new trial, the transcript from the hearing was not included in the appellate record and that the issue was waived. This court also concluded, though, that "even if not waived, we do not see how the defendant was prejudiced by the grandparents' testimony because it was not alleged that the defendant purposefully caused their injuries." *Id.*

At the post-conviction hearing, appellate counsel admitted that the transcript of the hearing on the motion for a new trial was inadvertently excluded from the appellate record. Although we conclude that appellate counsel failed to prepare an adequate record on appeal and that counsel failed to object contemporaneously to the testimony regarding the grandparents' injuries, the Petitioner has failed to establish prejudice. The Petitioner was charged with attempted first degree murder and aggravated assault of the victim, not the victim's grandparents. The testimony regarding their injuries was brief, and Mr. Watson testified that the injuries were not inflicted intentionally.

We note that the proof of the Petitioner's guilt was overwhelming. The victim testified that the Petitioner called her several times on the night of the offenses, that he threatened he could get to her if he wanted, and that he thought she was having an affair.

-19-

The victim noticed a "suspicious car following" her that night, and when she arrived home, the Petitioner began calling her repeatedly. The Petitioner arrived at the victim's grandparents' house around midnight, grabbed the victim and "went to sticking [her]." The Petitioner was known to carry a three- or four-inch pocketknife, and the victim realized after the attack that she had been stabbed in her left breast, left side, and toward the top of her head. The victim stated that the Petitioner called her the next day to apologize for his conduct. We conclude that the Petitioner failed to show that a reasonable probability exists that the result of the trial would have been different had the testimony regarding the grandparents' injuries been excluded. He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE